FILED

2010 Sep-29  PM 03:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CYNTHIA M. THOMAS,           ) | |
|                              ) | |
|     Plaintiff,               ) | |
|                              ) | |
|     vs.                      ) | Case Number: 2:08-CV-1884-SLB |
|                              ) | |
| HUMANA   MARKETPOINT,  INC.; ) | |
| STEVE STEVENSON,             ) | |
|                              ) | |
|     Defendants.              ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendants' Motion for Summary Judgment.  (Doc. 20.)[1]   Plaintiff Cynthia Thomas has sued her former employer, Humana MarketPOINT, Inc., and her former supervisor, Steve Stevenson, alleging that defendants discriminated against her on the basis of her age and her race, and that they retaliated against her for complaining about discrimination.  Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment, (doc. 20), is due to be granted.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

## II. <u>STATEMENT OF FACTS</u>

Exhibit A to the Scheduling Order states, "All material facts set forth in the statement required of the moving party [and of the opposing parties] will be deemed to be admitted for

summary judgment purposes unless controverted by the response of the party opposing summary judgment [or the movant]."  (Doc. 12, Ex. A at 4, 6 [emphasis omitted].)  Plaintiff did not dispute many of the facts set forth by defendants.  Therefore, these  uncontroverted facts are deemed admitted and are quoted below as bullet points.  The remaining facts set forth herein are derived from the parties' Briefs and the evidence viewed in the light most favorable to Ms. Thomas, the non-moving party.

- On December 29, 2004, [Ms. Thomas] applied for employment with Humana.  [(Doc. 21, Ex. 1 at 30, 46-47 and ex. 2.)]

- On January 10, 2005, [she] began working as a sales agent for Humana in its Tennessee market.  [(*Id*. at 48, 50, 52-53.)]

- [Ms. Thomas] was 59 years old.  [(*Id*. at 16.)]

- In August 2005, [Ms. Thomas] began working as a sales agent for Humana in its newly-formed Alabama market.  [(*Id*. at 55-56.)]

- Then, in or about October 2005, [Ms. Thomas] began working as a marketing sales support ("MSS") [specialist] in the Alabama market.  (*Id*. at 53, 57; *id*., Ex. 2 at 45-46, 48-49.)]

- When [Ms. Thomas] assumed the role of MSS, she became a part of Alabama's leadership team.  [(*Id*., Ex. 1 at 60.)]

- In March 2006, Steve Stevenson (white, age 34) became director of the Alabama market.  [(*Id*. at 60, 66; *id*., Ex. 2 at 22-23, 39.)]

- At all times relevant to this litigation, the Alabama leadership team consisted of Mr. Stevenson; Nick Durie, Sales Manager (white, age 34); Bobby Francis, Sales Manager (white, age 47); Jodi Hicks, Sales Manager (white, age 31); Timothy Merritt, Sales Manager (white, age 34); Gerald Stroh, Sales Manager (white, age 47); Sherbrina Watkins, Manager of Sales Administration (black, age 39) and [Ms. Thomas].  [(*Id*., Ex. 1 at 60-61; *id*., Ex. 2 at 23, 35, 59, 77-79; *id*., Ex. 5 ¶ 5.)]

3

• Initially, the leadership team worked out of the Huntsville, Alabama office.  [(*Id.*, Ex. 5 ¶ 5.)]

• However, in August of 2006, the leadership office's primary location was changed to Birmingham, Alabama.  [(*Id.*)]

• At all times relevant to this litigation, there were up to 48 sales agents working under Mr. Stevenson's leadership, and their ages ranged from 23 years old to 63 years old.  [(*Id.* ¶ 6.)].  [Footnote]

[Footnote: These numbers reflect the aforementioned employees' ages as of March 2006.  [(*Id.* ¶ 6.)]

(Doc. 21-24 at 2-3.)[2]  Ms. Thomas testified that Sherbrina Watkins had told her that the MSS "job should have been mine."  (Doc. 21, Ex. 1 at 109.)  "Mr. Stevenson noticed that there was a personality conflict between Ms. Watkins and [Ms. Thomas], but he advised both employees to work out their differences."  (Doc. 21-24 at 4 [citing doc. 21, Ex. 2 at 60-62, 70-71; *id.*, Ex. 5 ¶ 7].)  Ms. Thomas testified that other employees complained about Ms. Watkins.  (Doc. 21, Ex 1 at 278.)

• Eventually, every leadership team member, as well as some sales agents, approached Mr. Stevenson about their concerns with [Ms. Thomas's] attitude.  [(*Id.*, Ex. 2 at 72-73, 76-84, 140-41; *id.*, Ex. 5 ¶ 8.)]

• For instance, Ms. [Jodi] Hicks[, Sales Manager,] prepared a power point presentation for a leadership team meeting.  [(*Id.*, Ex. 2 at 81-83; *id.*, Ex. 5 ¶ 8.)]

---

[2]Defendants filed their Brief In Support of Motion for Summary Judgment as an exhibit to Document 21, their Evidentiary Submission in Support of Motion for Summary Judgment.  The court will refer to defendants' Brief as "doc. 21-24;" the page number will reflect the number printed at the bottom of the page and not the page number assigned by the CM/ECF system.

• In the power point slides, Ms. Hicks jokingly characterized many members of the leadership team, including depicting Mr. Stevenson as . . . "Larry The Cable Guy, [a] big fat redneck". [(*Id.*, Ex. 2 at 81-83, 145-47; *id.*, Ex. 5 ¶ 8.)]

• [Ms. Thomas] confronted Ms. Hicks, stating that Ms. Hicks had depicted [Ms. Thomas] as a fat, old lady. [(*Id.*, Ex. 1 at 191-92; *id.*, Ex. 2 at 81-83; *id.*, Ex. 5 ¶ 9.)]

• Although that was not Ms. Hicks'[s] intent [to insult Ms. Thomas], the slide was immediately removed (before the presentation). [(*Id.*, Ex. 2 at 81-83, 143-45; *id.*, Ex. 5 ¶ 9.)]

• Nonetheless, [Ms. Thomas] forwarded the power point slides to several sales agents and asked whether they would have also been offended by the same. [(*Id.*, Ex. 5 ¶ 9.)]

• On June 26, 2007, Mr. Stevenson sent out an e-mail to the entire leadership team, explaining that continued gossip and negativity would not be tolerated. [(*Id.*, Ex. 2 at 107-12 and ex. 3; *id.*, Ex. 5 ¶ 11.)]

• Mr. Stevenson encouraged each team member to act professionally and focus on his/her work. [(*Id.*, Ex. 2 at 107-12 and ex. 3; *id.*, Ex. 5 ¶ 11.)]

. . .

• On June 27, 2007, Mr. Stevenson contacted Shari Swartz, Human Resources Consultant, for advice on the situation [between Ms. Thomas and Ms. Watkins. [(*Id.*, Ex. 2 at 70-71, 140-41 and ex. 4; *id.*, Ex. 5 ¶ 13.)]

• Ms. Swartz advised Mr. Stevenson to have a meeting with Ms. Watkins and [Ms. Thomas], wherein they could voice any concerns with the working relationship and give ideas on ways to improve the same. [(*Id.*, Ex. 2 at 70-71; *id.*, Ex. 5 ¶ 13.)]

• In . . . August [or] September 2007, [Ms. Thomas] complained to Mr. Stevenson that Ms. Watkins had discussed [her] salary with a non-Humana employee. [(*Id.*, Ex. 2 at 120-24, 137 and ex. 5; *id.*, Ex. 5 ¶ 14.)]

• Mr. Stevenson questioned Ms. Watkins about [Ms. Thomas's] claim, and Ms. Watkins admitted that she generally [had] commented to someone that "[Plaintiff] made more than [Ms. Watkins] did." [(*Id.*, Ex. 2 at 120, 137 and ex. 5; *id.*, Ex. 5 ¶ 14.)]

• Mr. Stevenson reprimanded Ms. Watkins, explaining that it was inappropriate for her to make any comments regarding salary information. [(*Id.*, Ex. 2 at 120, 137 and ex. 5; *id.*, Ex. 5 ¶ 14.)]

• Ms. Watkins understood that her comment was inappropriate and agreed not to engage in future discussions about the same. [(*Id.*, Ex. 2 at 120, 137 and ex. 5; *id.*, Ex. 5 ¶ 14.)]

• Subsequently, on September 17, 2007, Mr. Stevenson met with Ms. Watkins and [Ms. Thomas]. [(*Id.*, Ex. 2 at 120, 137 and ex. 5; *id.*, Ex. 5 ¶ 15.)]

• Mr. Stevenson explained that the salary comment had been addressed and similar discussions would not occur again. [(*Id.*, Ex. 2 at 120, 137 and ex. 5; *id.*, Ex. 5 ¶ 15.)]

• Mr. Stevenson continued by stating that Ms. Watkins's and [Ms. Thomas's] working relationship had to improve. [(*Id.*, Ex. 2 at 120, 137 and ex. 5; *id.*, Ex. 5 ¶ 15.)]

• He advised that, if the situation did not improve, he would be forced to make an employment decision. [(*Id.*, Ex. 5 ¶ 16.)] . . .

• [Ms. Thomas and Ms. Watkins] then discussed potential solutions to improve their working relationship. [(*Id.*, Ex. 2 at 120-34, 137 and ex. 5; *id.*, Ex. 5 ¶ 16.)]

• At the conclusion of the meeting, both employees expressed that the meeting seemed productive. [(*Id.*, Ex. 5 ¶ 16.)]

• [T]he next day, [Ms. Thomas] called Humana's Ethics Help Line, which is a 24-hour, 7 days per week service provided to Humana's employees to report any discrimination, unfair treatment, harassment, etc. [(*Id.*, Ex. 1 at 317-21 and ex. 15.)]

. . .

6

• [Ms. Thomas] stated that she wanted Ms. Watkins to be removed from the Birmingham office and assigned to the Huntsville office. [(*Id.*, Ex. 1 at 317-21 and ex. 15.)]

• In fact, Mr. Stevenson had already assigned Ms. Watkins to work primarily in the Huntsville office, in an effort to reduce any tension between her and [Ms. Thomas]. [(*Id.*, Ex. 2 at 124, 127; *id.*, Ex. 5 ¶ 7.)]

• After interviewing [Ms. Thomas], Associate Relations concluded that Mr. Stevenson had properly addressed the situation. [(*Id.*, Ex. 1 at 317-21 and ex. 15.)]

• Associate Relations advised [Ms. Thomas] of the findings and further advised that employees would not be relocated simply because they do not get along. [(*Id.*)]

. . .

• On or about December 4, 2007, [Ms. Thomas] was terminated for violating Humana's Critical Offense Policies and Procedures. [(*Id.*, Ex. 1 at 129-30 and ex. 9; *id.*, Ex. 2 at 90-94 and ex. 1; *id.*, Ex. 5 ¶ 18.)]

• In the termination memo, several examples of critical offenses were cited. [(*Id.*, Ex. 1 at 129-30 and ex. 9; *id.*, Ex. 2 at 90-94 and ex. 1.)]

(Doc. 21-24 at 4-9.)

The termination memo from Stevenson to Thomas stated:

Humana has a philosophy within our organization to comply with all Associate Work Life Policies and Procedures.  Emphasis is centered on meeting all requirements of your job role profile.  This would include behavioral standards [and] how they impact our organization, associates, and business goals.

We have found that you have committed numerous violations of Humana's Critical Offense Policies and Procedures.

7

*Critical Offense Examples*:

- Forwarded an electronic communication to Sales Associate (Carol Nowak), where you provide confidential information disparaging the leadership team, as well as other associates. The communication contains one-sided slanderous and inaccurate information, where formulation of opinions could hinder associate production, perception, and undermine management leadership and directives.

- I received a call from my sales manager on Nov. 13th stating that one of his agents was upset because you were rude in your interaction with an agent. Nov. 14th, Rebecca Maddux called me to discuss the phone call with you. The initial issue stemmed from a small paper ad that was paid for by the agent (Rebecca). She addressed you to see if she should run the ad and your response was "we didn't have the money in our budget". I was confused with this because you and I discussed how successful these ads were working and we had a recent increase in budget. Rebecca ended up paying for the ad out of her pocket. She later found out that you ran the ad for her and Dan Stevens without notifying her or her sales manager. Rebecca and Timothy Merrit (her Sales Manager), were discussing the seminar, and Rebecca said she was doing everything she could to help fill the seminar, and mentioned to Tim that she even ran an ad. Tim asked why she paid for it and Rebecca explained. I received a call and an email from Tim to try to get Rebecca reimbursed and got the o.k. from Frank Altier (RVP). I asked you for info to make a decision, and your email tone was defensive and not clear. After requesting this info, you called Rebecca and according to Rebecca this was what was discussed . . . . Cindi called up Rebecca irate that she mentioned to Tim that she had to pay for the ad. She demanded Rebecca to get on her email and read the information. She also said Rebecca is "throwing her under the bus and trying to get her fired". Cindi said she will not let that happen and went on what Rebecca called a Tirade.

- I received a call Nov. 15th [from] [Carol] Nowak complaining about you and some comments you were making about one of our associates (Rebecca Maddux). [Nowak] said that you were

8

mad at Rebecca for talking to her manager about a 225 ad placed.  She said you stated "Rebecca must be using drugs again"[3] and went on about how much it irritated you that Rebecca, would make you look bad.  [Nowak] was upset because she didn't feel like the conversation was appropriate or professional and contacted her Sales Manager Bobby Francis.  Bobby told her that I need to be aware of these issues and recommended she call me.  [Nowak] called and confirmed that you were spreading rumors that Rebecca was on drugs.

Your competency level continues to fall below expectations.  Due to the critical offenses listed above, your employment with Humana will be terminated immediately.

(Doc. 21, Ex. 1. ex. 9.)

The Critical Offenses Policy is part of Humana's Associate Work-Life Policies and Procedures.  (Doc. 21, Ex, 1, ex. 4 at 1.)  The purpose of the policy is to "establish[ ] a process for resolving situations resulting from violations of laws, company policy or rules, or behavioral standards that jeopardize Humana's associates, customers and business goals."

 (*Id*.)  Examples of Critical Offenses include, but are not limited to – "[t]hreatening, intimidating or coercing associates, customers or others;" "[i]mmoral or indecent conduct;" "[b]ehavior or conduct detrimental to customer service, other associates or Humana's operations;" "insubordination or taking deliberate steps to undermine management," and

_____

[3]Ms. Nowak testified that she had told Mr. Stevenson that Ms. Thomas had been "***wondering***" whether Ms. Maddux was "using drugs again and maybe forgetting things." (Doc. 21, Ex. 4 at 13 [emphasis added].)  Nowak denies telling Stevenson that Ms. Thomas told her that Ms. Maddux "***must*** be using drugs again."  (*Id*. [emphasis added].)

"[b]latant, willful rudeness or lack of sensitivity to associates, customers or others." (*Id*. at 2-3.)

      • At the time of her termination, [Ms. Thomas] was 62 years old. [(*Id.*, Ex. 1 at 16.)]

      • After [Ms. Thomas's] termination, she was replaced by Ms. Watkins. [(*Id.*, Ex. 2 at 67, 134-36; *id*., Ex. 5 ¶ 26.)]

      • Ms. Watkins was 41 years old. [(*Id.*, Ex. 2 at 59; *id*., Ex. 5 ¶ 26.)]

. . .

      • On December 5, 2007, the day after her termination, [Ms. Thomas] wrote an appeal letter to Fred Wheeler, Vice President, asking that her termination be reviewed and indicating that she was treated less favorably than [Robert Francis, Mr. Stevenson, Timothy Merritt, and Sherbrina Watkins]. [(*Id*., Ex. 1 at 321-22 and ex. 16.)]

(Doc. 21-24 at 12.)

      • [Ms. Thomas's] appeal was reviewed by Frank Altier, Humana's Regional Vice President (white, age 52), who upheld the termination decision. [(*Id*., Ex. 1 at 331-32 and ex. 17; *id*., Ex. 5 ¶ 37).]

      . . .

      • Further, in addition to [Ms. Thomas], there were approximately thirteen (13) other [Marketing Sales Support Specialists] in the southeast region. [(*Id*., Ex. 5 ¶ 36.)]

      • At all times relevant to this litigation, half of these MSSs ranged in age from 41 years old to 68 years old. [(*Id*.)]

      • [Ms. Thomas] was the only employee in this age range to be terminated. [(*Id*.)]

(Doc. 21-24 at 15.)

On December 17, 2007, Ms. Thomas filed an EEOC charge, which stated:

I am a female of the protected age (62).  I began my employment with [Humana] on January 10, 2005, as a Sales Representative.  On or about April 2006, Steve Stevenson was promoted to Director.  Since Stevenson's promotion, I have been harassed and treated less favorably with respect to the terms and conditions of employment.  I believe my co-workers are treated more favorably because they are much younger than I am at least by 15-20 years.  Also, Steve Stevenson, Director[,] is approximately 35 years old.

I was terminated on December 4, 2007, and [Humana] indicated it was due to my competency and critical offenses that had occurred.  I believe other coworkers have committed the same or more serious offenses and they have not been terminated.

I believe I have been discriminated against because of my age, in violation of the Age Discrimination in Employment Act of 1967, as amended.

(Doc. 2, Ex. A.)  Plaintiff was issued a Right-to-Sue letter on August 14, 2008.  Plaintiff also filed a claim for unemployment compensation with the Alabama Department of Industrial Relations.  (Doc. 21, Ex. 1 at 357-58 and ex. 20.)

• After [Ms. Thomas] was denied any unemployment compensation benefits, she appealed the determination.  [(*Id*.)]

• During a hearing before the Hearings and Appeals Division, [Ms. Thomas] testified in support of her application; however, she never mentioned that she believed that she was harassed or terminated because of her age, race or in retaliation for making complaints of discrimination.  [(*Id*. at 358 and ex. 20.)]

• The determiner's decision was affirmed, and [Ms. Thomas] did not appeal the decision of the Hearings and Appeals Division.  [(*Id*. at 358-60 and ex. 20.)]

(Doc. 21-24 at 16-17.)

The Decision on Unemployment Compensation Claim found that Humana had

"discharged [Ms. Thomas] on December 4, 2007, for insubordination after she e-mailed critically offensive material about the company to her subordinates.  The e-mail consisted of nine pages and contained negative comments about the company, team meetings and questioned the leadership initiative.  The claimant was in a leadership position and this e-mail was considered inappropriate communications with the other associates."  (Doc. 21, Ex. 1, ex. 20.)  As a result, the Administrative Hearing Officer concluded that Ms. Thomas had been discharged for misconduct, and her claim for unemployment compensation was denied. (*Id.*)  She did not appeal this decision to the Alabama Circuit Court.

Ms. Thomas filed her Complaint on October 10, 2008.  (Doc. 1.)  In her original Complaint, she alleged the following claims against defendants Humana and Mr. Stevenson: (1) age discrimination in violation of the ADEA with regard to her termination and a hostile work environment, (2) race discrimination in violation of Title VII with regard to her termination, (3) race discrimination in violation of §1981 with regard to a hostile work environment, (4) retaliation in violation of the ADEA and §1981 with regard to her termination, and (5) violations of the First and Fourteenth Amendments pursuant to § 1983. (*Id.*) Following defendants' Motion to Dismiss, the court dismissed Ms. Thomas's Title VII and § 1983 claims, her ADEA retaliation claims, and her ADEA claims based on her termination and hostile work environment against Mr. Stevenson in his individual capacity. (Doc. 10.)  On February 26, 2009, Ms. Thomas filed an Amended Complaint against defendants alleging (1) age discrimination with regard to a hostile work environment and

12

discharge, (doc. 13 ¶¶ 18-26, 40-42), (2) race discrimination, in violation of § 1981, with regard to a hostile work environment and discharge, (*id*. ¶¶ 28-32, 40-42), and (3) retaliation in violation of § 1981, (*id*. ¶¶ 34-38, 40-42).

### III.  <u>DISCUSSION</u>

### A.  CLAIMS AGAINST STEVENSON IN HIS INDIVIDUAL CAPACITY

In a prior Order, this court dismissed with prejudice Ms. Thomas's Age Discrimination in Employment Act ["ADEA"] claims against Mr. Stevenson in his individual capacity.  (Doc. 10.)  Thereafter, she filed an Amended Complaint, which reasserted her ADEA claims against Mr. Stevenson in his individual capacity.  (*Compare* doc. 13 ¶¶ 18-26 [Count One – ADEA claims] *with id*. ¶¶ 40-42 [Count Four – "Imputed" ADEA liability].)  In response to defendants' Motion for Summary Judgment as to her ADEA claims against Stevenson in his individual capacity, Ms. Thomas contends:

> As a preliminary matter, Plaintiff avers that she is well aware of the fact that Defendant Stevenson, as an employee, cannot be held individually liable for violations of the ADEA.  In recognition of this fact, Plaintiff, in her Amended Complaint, removed any and all causes of action related to the same.  Plaintiff only references Stevenson's actions from the standpoint that they were discriminatory, and that his actions may be imputed to Humana, against whom Plaintiff's ADEA claim is actually being brought.  [(Doc. 13 ¶ 40.)]  No separate ADEA claim is currently being brought against Stevenson.

(Doc. 23 at 11.)

To the extent Ms. Thomas's Amended Complaint can be read to allege ADEA claims against Mr. Stevenson in his individual capacity, such claims are due to be dismissed.

Defendants' Motion for Summary Judgment will be granted and her ADEA claims against Mr. Stevenson in his individual capacity will be dismissed.

## B.  HOSTILE WORK ENVIRONMENT – ADEA AND § 1981

Ms. Thomas's § 1981 claims against Mr. Stevenson are based on the same alleged conduct as her § 1981 claims against Humana.[4]  Therefore, the analysis of these claims, set forth below,  is identical.

In her Amended Complaint, Ms. Thomas argues that she was subjected to a hostile and abusive work environment based on her age and her race.  (Doc. 13 ¶¶ 24-25, 30-31.) She claims her work environment was hostile and abusive because Mr. Stevenson "regularly and continuously criticiz[ed] [her] work performance," he "threaten[ed] to terminate [her] employment," and he made "disparaging comments about Plaintiff to [her] coworkers." (*Id.* ¶¶ 24, 30.)

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v.*

---

[4]"Unlike a Title VII claim, a § 1981 claim may be brought against an individual supervisor.  Federal courts have held that a claim for individual liability under § 1981 requires an affirmative showing linking the individual defendant with the discriminatory action." *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp. 2d 1334, 1355-56 (S.D. Ala. 2010)(citing *Shotz v. City of Plantation*, 344 F.3d 1161, 1176 (11th Cir. 2003); *Schanfield v. Sojitz Corp. of America*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009); *Wallace v. DM Customs, Inc.*, 2006 WL 2882715, *7 (M.D. Fla. Oct. 6, 2006); *Moss v. W & A Cleaners*, 111 F. Supp. 2d 1181, 1187 (M.D. Ala. 2000))(internal citations omitted).

*Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998).  To establish a claim for a

discriminatorily hostile or abusive working environment, an employee must show:

> (1) that [she] belongs to a protected group; (2) that [she] has been subject to
> unwelcome harassment; (3) that the harassment must have been based on a
> protected characteristic of the employee . . .; (4) that the harassment was
> sufficiently severe or pervasive to alter the terms and conditions of
> employment and create a discriminatorily abusive working environment; and
> (5) that the employer is responsible for such environment under either a theory
> of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

"The fourth element – that the conduct complained of was sufficiently severe or

pervasive to alter the conditions of employment and create an abusive work environment –

is the element that tests the mettle of most [discriminatory] harassment claims."  *Gupta v.*

*Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *abrogated on other grounds*

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  "Not every unpleasantness

experienced in the workplace goes into this calculation."  *Nicholson v. City of Daphne*, Civil

Action No. 07-0496-WS-M, 2009 WL 4667382, *3 (S.D. Ala. Nov. 25, 2009).

> Although [the court] examine[s] the statements and conduct complained
> of collectively to determine whether they were sufficiently pervasive or severe
> to constitute [racial and/or ageist] harassment, the statements and conduct must
> be of a [racial or ageist] nature . . . before they are considered in determining
> whether the severe or pervasive requirement is met.  Innocuous statements or
> conduct, or boorish ones that do not relate to the [race or age] of the actor or
> of the offended party (the plaintiff), are not counted.

*Gupta*, 212 F.3d at 583 (internal quotations and citations omitted); *see Robinson v. LaFarge*

*North America, Inc.*, 240 Fed. Appx. 824, 829 (11th Cir. 2007)(citing *Gupta*)(unpublished);

*see also Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999)("It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory."), *quoted in Cote v. Shinseki*, No. 8:07-CV-1524-T-TBM, 2009 WL 1537901, *13 (M.D. Fla. June 2, 2009).  Also, "discrete acts that must be challenged as separate statutory discrimination and retaliation claims," and "cannot be brought under a hostile work environment claim that centers on 'discriminatory intimidation, ridicule, and insult.'" *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir.)(citing and quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111-13, 116 (2002)), *cert. denied* 129 S. Ct. 404 (2008).

As evidence of harassment, Ms. Thomas complains:  (1) "she [was] the only individual in her office that was required to engage in duties outside of the scope of [her] employment;"[5] (2) "she was regularly subjected to harsh criticism and belittlement at the hands of Defendant Stevenson,"[6]  and (3) "Stevenson showed favoritism towards an

_____

[5]A change in a job assignment is a discrete act that cannot be considered part of a hostile work environment. *See Freeman v. City of Riverdale*, 330 Fed. Appx. 863, 866 (11th Cir. 2009)("Freeman cannot establish a hostile work environment by reference to his 2001 or 2003 terminations, his assignment to janitorial tasks upon reinstatement, or the denial of his requests for training, because they were discrete acts that were required to be challenged separately."); *see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970 (11th Cir. 2008)("In this case, CCBCC's hiring decisions, light work assignments, and alleged retaliation constituted discrete acts, not acts that were part of a hostile work environment.").

[6]The court notes a discrimination "claim rarely may be predicated merely on employer's allegedly unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment."

16

African-American female that was over twenty years Plaintiff's junior, and that individual ultimately replaced Plaintiff upon her discharge." (Doc. 23 at 14-15.) She also testified that Stevenson told her that he had more complaints about her than about anyone else, that she was snippy, and that she made faces. (Doc. 21, Ex. 1 at 78-79, 174-75.) She also testified that Jodi Hicks called her crazy. (*Id*. at 174-75.) These incidents do not constitute "intimidation, ridicule, and insult" of a racial or ageist nature; therefore, they are not counted as acts creating a hostile work environment based on discrimination. *See Gupta*, 212 F.3d at 583. The court finds that Ms. Thomas has not shown that the alleged ageist and racial harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and to create a discriminatorily abusive working environment. *See Miller*, 277 F.3d at 1275.

---

*Davis v. Town of Lake Park*, 245 F.3d 1232, 1242 (11th Cir. 2001).

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of [federal anti-discrimination laws] to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance. Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee.

*Id*.

17

The court will grant defendants' Motion for Summary Judgment as to Ms. Thomas's race and age discrimination claims based on a hostile work environment and such claims will be dismissed.

## C.  DISCHARGE – ADEA, § 1981, AND RETALIATION

### 1.  *Gross v. FBL Financial Services*, 129 S. Ct. 2343 (2009)

Defendants contend, after *Gross v. FBL Financial Services*, "Plaintiff cannot simultaneously argue that Defendants discriminated against her because of age, race, in retaliation for complaints of the same, or all of the above."  (Doc. 21-24 at 19-20 [citing *Culver v. Birmingham Board of Education*, 646 F. Supp. 2d 1272, 1272 (N.D. Ala. 2009)(citing *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009)].)

In *Gross*,

> The Supreme Court concluded that ADEA claims are not subject to the burden-shifting protocol set forth for Title VII suits in *Price Waterhouse* [*v. Hopkins*, 490 U.S. 228 (1989)].  *Gross*, 129 S. Ct. at 2349 ("*This Court has never held that [Price Waterhouse's] burden-shifting framework applies to ADEA claims.  And, we decline to do so now.*").  In addition, the Supreme Court ruled out the idea of a "mixed motive" ADEA claim, instead requiring plaintiffs to show that age was the "but for" cause of an employment action. *Id*. at 2350.  The ADEA requires that "age [be] the 'reason' that the employer decided to act."  *Id*.  Because an ADEA plaintiff must establish "but for" causality, no "same decision" affirmative defense can exist:  the employer either acted "because of" the plaintiff's age or it did not.  *Id*. at 2352 ("*The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision*.").

*Mora v. Jackson Memorial Foundation, Inc.*, 597 F.3d 1201, 1203-04 (11th Cir. 2010)(emphasis in original).

18

In *Culver v. Birmingham Board of Education*, the case cited by defendants, the district court held that a plaintiff cannot "***allege*** alternative proscribed employer motives" – such as age, race and retaliation. *Culver*, 646 F. Supp 2d at 1272 (emphasis added). However, "Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims."[7] *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009).

Therefore, in deciding the Motion for Summary Judgment, this court will consider Ms. Thomas's claims that defendants acted with proscribed motives. She has not argued, and the court has not considered, whether defendants acted with mixed motives.

## 2. Prima Facie Case

### a. Age and Race Discrimination

In this circuit –

---

[7]Rule 8(d) provides:

(1) In General.  Each allegation must be simple, concise, and direct.  No technical form is required.

(2) Alternative Statements of a Claim or Defense.  A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

(3) Inconsistent Claims or Defenses.  A party may state as many separate claims or defenses as it has, regardless of consistency.

Fed. R. Civ. P. 8(d).

[A] plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: '(1) [she] belongs to a racial minority; (2) [she] was subjected to adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [she] was qualified to do the job.'"

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)(quoting *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006). The prima facie case for age discrimination is the same. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000)("One method a plaintiff can use to establish a prima facie case for an ADEA violation is by showing that he (1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual.").

The evidence is undisputed that Ms. Thomas was replaced by Ms. Watkins, who is a younger African-American female. This evidence is sufficient to establish a prima facie case of age and race discrimination with regard to Ms. Thomas's termination.

### b. Retaliation

In order to establish a prima facie case of retaliation in violation of the ADEA and § 1981, Ms. Thomas must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009); *Hairston v. Gainesville*

*Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008)(citing *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073, 1075 n.54 (11th Cir. 1995)). "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Id*. (citing *Coutu*, 47 F.3d at 1075 n.54).

Defendants argue:

> Plaintiff's retaliation claim fails because she cannot establish that she engaged in any protected activity or that there is a causal connection between her complaints and any adverse employment action.
>
> It is undisputed that, during her employment with Humana, Plaintiff never complained that she believed that she was the victim of unlawful harassment, discrimination or retaliation. [(Doc. 21, Ex. 1 at 313-14, 317-24 and ex. 15.)] As there is no protected activity, Plaintiff cannot establish causation. Even if this Court finds that Plaintiff engaged in protected activity (which Humana vehemently denies), there is no causal connection between this activity and any adverse employment action.

(Doc. 21-24 at 26-27.)  Ms. Thomas contends that her call to Humana's Ethics line is protected activity and the three months between the call and her termination establish the required causal connection.

The court, by separate Order, has stricken Ms. Thomas's testimony that she complained about discrimination on the Ethics Line.  Therefore, the evidence before the

court demonstrates that she did not complain about discrimination and the record contains no other evidence that Ms. Thomas engaged in any protected activity prior to her termination. The court finds that she had not shown a prima facie case of retaliation.

Defendants' Motion for Summary Judgment as to plaintiff's retaliation claim will be granted.

### 3.  Defendants' Articulated Reasons

If plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason or reasons for its decision. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2007).

Mr. Stevenson testified that he, with the agreement of Human Resources Department, terminated Ms. Thomas "for violating Humana's Critical Offense Policies and Procedures." (Doc. 21, Ex. 5 ¶¶ 18, 25.)  The violations included (1) forwarding an email to sales agents in which she made negative and disparaging comments about members of Humana's leadership team; (2) telling Rebecca Maddux that she did not have money for advertising Maddux's seminar; (3) accusing Maddux of trying to get her fired;  and (4) telling another employee, Nowak, that she wondered if Maddux was using drugs again.  (*Id*. ¶¶ 19-20, 22-23; *id*., Ex. 1, ex. 9.)   This evidence is sufficient to satisfy defendants' burden to articulate their reasons for discharging Ms. Thomas.

### 4.  Pretext

22

Because defendants have satisfied their burden, Ms. Thomas must rebut defendants' reasons either (1) by presenting evidence that discrimination was the real reason for the decision, or (2) by presenting evidence that defendants' reasons are "unworthy of credence." *See Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied* 546 U.S. 960 (2005).

> To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.

*Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005)(internal quotations and citations omitted). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)). "Where multiple reasons are advanced, the plaintiff must show that ***each*** reason was pretextual." *Champ v. Calhoun County Emergency Management Agency*, 226 Fed. Appx. 908, 913 (11th Cir. 2007)(citing *Cooper v. Southern Co.*, 390 F.3d 695, 725-26 (11th Cir. 2004))(emphasis added; unpublished opinion); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000)("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that ***each*** of the employer's

proffered nondiscriminatory reasons is pretextual." (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997)))(emphasis added).

Ms. Thomas argues:

[A]t the summary judgment stage, while the plaintiff bears the burden of production, once she has produced evidence that has the potential of discrediting the supposedly non-discriminatory reasons proffered by the defendant for engaging in the complained-of employment action, summary judgment is not appropriate, even if the defendant produces evidence in support of its position. Defendants attribute the commission of alleged "critical offenses" to Plaintiff in arguing that her termination was proper and free of discriminatory and retaliatory intent. Defendants also argue that Plaintiff cannot establish that any other Humana employee was treated more favorably than her. However, Plaintiff's testimony rebuts the latter contention (Depo. of Cynthia M. Thomas, p. 288-290),[8] and there is enough evidence of

---

[8]These pages of Ms. Thomas's deposition state:

Q. Have you told me about – because you talk about employees, you believe co-workers were treated – well you say you were treated less favorably than your co-workers. Have you told me about the co-workers that you believe were treated more favorably?

A. I always felt Sherbrina was treated extremely favorably, I just always felt it. I mean, for whatever the reason, that's how I felt.

Q. Okay. And you've given me the examples of her not being required to move to Birmingham?

A. [Yes.]

Q. Any other situation where you felt like she was treated more favorably?

A. Well no. That's a pretty big one. Oh, this is probably just nothing, but it just was part of the work environment. I guess I would see or feel like she was getting some kind of special treatment, and I just never quite

irregular occurrences, as set forth in §§II(D), (E), and (F), *supra*, to raise genuine issues of fact regarding the veracity of Defendants' proffered reason for terminating Plaintiff's employment. The facts and testimony proffered by Plaintiff carry great rebuttal potential . . . .

(Doc. 23 at 23.)  As evidence of "irregular occurrences" in these sections of her Response to Defendants' Motion for Summary Judgment, plaintiff states:

1. Plaintiff only received complaints about her attitude after Stevenson became her supervisor.  (*Id*. at 19.)

2. Plaintiff did not threaten or intimidate fellow co-workers.  (*Id*. at 20.)

3. "Plaintiff and Watkins published sensitive information about another person to third parties.  The only difference is that while Watkins received a verbal reprimand, and was advised to talk with Plaintiff in the hopes of improving their relationship, Plaintiff was swiftly terminated, and was afforded no opportunity to discuss her grievances with any of the persons allegedly 'disparaged' by her email."  (*Id*. at 20.)

---

understood that.  But because Steve flew in and out of town so frequently –

. . .

A.  There would be – he would – Sherbrina would almost always pick him up.  In other words, she wouldn't come into the office that morning, but she would come in, evidently, at the time he was going to land and pick him up and bring him to the office, and that was neither here nor there.

But there was only a few times that Steve would yell out, "Cindi, can you take me to the airport this afternoon" or whatever.  And what I noticed was, if Sherbrina was in there, she just didn't like it.  "Steve, I'll take you."  And I, just at some point, I just got the feeling that if he didn't ask her to do it every time  . . . that maybe she might complain about it or say – it was no big deal.  It was just taking him to airport or picking him up.

(Doc. 21, Ex. 1 at 288-90.)

25

Ms. Thomas also argues that a "reasonable person could infer" that Mr. Stevenson's "highly irregular behavior . . . (including preferential treatment [of] Watkins . . .)" demonstrated that he acted with "racial or age-related bias and/or animus." (*Id*. at 20-21.) However, Mr. Stevenson's dislike of Thomas alone "is insufficient to establish that discrimination was the real reason for [Thomas's] termination." *See Bojd v. Golder Associates, Inc.*, 212 Fed. Appx. 860, 862 (11th Cir. 2006)(citing *Hawkins v. Ceco Corp.*, 883 F.2d 977, 986 (11th Cir. 1989)("dislike alone is not evidence of racial discrimination"))(unpublished). She also points to the fact that Nowak was terminated "because she asked to review the statements that were allegedly 'attributed' to her and that led to Plaintiff's discharge." (*Id*. at 21.)

Ms. Thomas's evidence does not meet head-on and rebut defendants' articulated reasons for terminating her. Nothing in her evidence disputes Stevenson's testimony that every member of Ms. Thomas's team complained about her. Also, her disdain for Watkins is evident throughout her testimony. The evidence does not show that Ms. Watkins engaged in any conduct arguably constituting a critical offense other than her remark regarding Ms. Thomas's salary. However, defendants have presented evidence of multiple critical offenses committed by Ms. Thomas. Ms. Thomas and Ms. Watkins are not similarly-situated for purposes of comparing the disciplinary decisions of defendants.[9] Moreover, Ms. Thomas

---

[9] *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999)("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges;"

26

admits that she raised the possibility of Ms. Maddux using drugs to Ms. Nowak and that she sent the disparaging email.  Her evidence of Mr. Stevenson's more favorable treatment of Ms. Watkins and the circumstances of Ms. Nowak's termination, together with her evidence that she did not, in fact, have a bad attitude, are insufficient to rebut head-on *each* of defendants' articulated reasons for her termination. *See Bojd*, 212 Fed. Appx. at 862-64; *see also Champ*, 226 Fed. Appx. at 913; *Crawford v. City of Fairburn*, 482 F.3d 1305, 1309 (11th Cir. 2007); *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002).

Defendants' Motion for Summary Judgment is due to be granted and Ms. Thomas's claims of discriminatory discharge based on race and age discrimination are due to be dismissed.

## D.  PRECLUSIVE EFFECT OF UNEMPLOYMENT HEARING

Because the court finds that Ms. Thomas has not rebutted defendants' Motion for Summary Judgment, the court pretermits discussion of whether "Plaintiff is collaterally estopped from re-litigating the reasons for her discharge," based on the determination of her application for unemployment benefits.  (Doc. 21-24 at 30.)  Nevertheless, the court notes that the Supreme Court and the Eleventh Circuit Court of Appeals have held that "judicially unreviewed administrative hearings" have no preclusive effect under the ADEA.  *See Astoria Federal Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 109-14 (1991); *Delgado v.*

---

finding female plaintiff, with four violations, was not similarly situated to male employees with only one violation).

*Lockheed-Georgia Co.*, 815 F.2d 641, 646-47 (11th Cir. 1987).  However, as to the § 1981 claim, the findings of fact of the unemployment agency would have "the same preclusive effect to which it would be entitled in the State's courts." *University of Tennessee v. Elliott*, 478 U.S. 788, 796-97, 799 (1986).

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law.  An Order granting defendants' Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 29th day of September, 2010.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE